UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TISBURY TOWING & | ) | Civil Action No. 16-11857-LTS |
| TRANSPORTATION, INC., Tug M/V | ) | |
| THUBAN, its engines, boilers, tackle, etc., | ) | |
| in rem, and Barge HYDRA 1200, its | ) | |
| appurtenances, etc., in rem, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

FINDINGS OF FACT AND CONCLUSIONS OF LAW

July 25, 2019

SOROKIN, J.

The United States of America has brought an in rem claim against defendant vessels tug M/V Thuban and barge Hydra 1200, both owned and operated by Tisbury Towing & Transportation, Inc. ("Tisbury"), for their alleged violation of the Rivers and Harbors Act, 33 U.S.C. § 408, on September 19, 2013 at the New Bedford Hurricane Barrier ("Hurricane Barrier") near New Bedford, Massachusetts. The parties stipulate to defendants' liability and dispute only the amount of damages. The Court held a bench trial on this claim on June 10–14, 2019, and now "find[s] facts specially and state[s] its conclusions of law separately" herein as required by Fed. R. Civ. P. 52(a). The Court awards damages on this claim to the United States as explained herein.

I.      FINDINGS OF FACT

The Court makes the following factual findings based on materials submitted by the parties, the credible testimony offered at the trial, and the Court's view of the Hurricane Barrier on June 10, 2019.

The United States Army Corps of Engineers ("the Corps") owns and maintains the Hurricane Barrier. Construction of the Hurricane Barrier was completed in 1966. The barrier consists primarily of two dikes that cross the mouth of the Acushnet River. A 150-foot opening between the two dikes provides a navigation channel into the harbor. That opening is gated by two 60-foot steel structures that can be closed at times of anticipated flooding but are typically open. The steel structures each rest on six steel wheels on which they can turn to close off the navigation channel. When the gates are open, eight vertical gate guide beams connected by horizontal trusses face the navigation channel on each side of the Hurricane Barrier. The Corps numbers these beams, and the beams on the eastern side of the gate that are of particular relevance to this case are numbered G-5, G-6, and G-7. As of 2013, all but two of the gate guide beams were original to the Hurricane Barrier's construction. Ten wooden fenders connect each pair of gate guide beams to protect the gate from boat impacts, for a total of seventy wooden fenders.

When the Hurricane Barrier requires maintenance, the Corps inserts rectangular stop gates into the gate guide beams, creating a pocket that can be drained to allow maintenance on the gate wheels and steel trusses. The Corps calls this process dewatering. In June 2011, the Corps performed its most recent periodic inspection on the Hurricane Barrier. Ex. 18. It performed its most recent dewatering in July 2012, at which time the gate guide beams were sufficiently intact to enable a successful dewatering.

On the evening of September 19, 2013, the defendant vessels attempted to pass from the harbor into Buzzards Bay through the Hurricane Barrier's navigation channel. The barge was carrying 1,232 tons of crushed blue stone. As the barge passed through the channel, it struck the eastern portion of the gate at gate guide beam G-6, causing damage to the gate. Two federal employees observed the allision from the Hurricane Barrier's operating house, located on the western side of the gate. The allision was also captured on film by a security camera mounted on the operating house.

On October 5, 2013, the Corps conducted a dive inspection of the damage to the Hurricane Barrier. During the inspection, divers inspected gate guide beams G-5, G-6, and G-7 on the Hurricane Barrier's eastern side, which were in the area the barge struck. Gate guide beam G-6 and its truss connections appeared damaged down to the third truss, while the other two gate guide beams appeared undamaged. Ex. 5 at US000042–43. All the wooden fenders between gate guide beams G-5 and G-6 were missing or damaged. Id. As a result, Corps engineer John Kedzierski proposed replacing gate guide beam G-6 "from the top to Truss III" and replacing all the wooden fenders. Id.

Accordingly, the Corps solicited bids to repair the damage to the Hurricane Barrier using specifications that described cutting gate guide beam G-6, welding a replacement portion onto the intact portion of the beam, and replacing 20 wooden fenders. See Ex. 11. The Corps received bids for $438,000, $899,000, and $574,000, Ex. 6, and, on April 18, 2014, awarded the contract to Kovilic Construction Co., Inc. ("Kovilic"), the low bidder, Ex. 7 at 2. On September 26, 2014, the Corps modified the contract with Kovilic to include the replacement of ten additional wooden fenders for an additional $111,371. Ex. 8.

On October 14, 2014, defendants' expert Duncan Mellor personally inspected the damaged Hurricane Barrier with divers from Northeast Diving Services, Inc., a commercial diving company. Ex. 209. Mellor and the divers inspected the damage to the Hurricane Barrier, including the gate guide beams and wooden fenders, both above and below water.

On October 25, 2014, divers working for Kovilic's subcontractor cut gate guide beam G-6 at the third truss. See Ex. 13 at US000166–68. After the cut was performed, the lower portion of the beam—the portion that remained after the portion above the third truss was removed—was observed to be twisted and therefore still damaged, requiring further repair. See Ex. 76 (showing the top of the lower portion of gate guide beam G-6 after the cut was made). On December 12, 2014, as a result of the remaining damage, the Corps made a second modification to the contract with Kovilic to include replacing the lower portion of gate guide beam G-6 for an additional $261,785. Ex. 9. Kovilic then completed its performance under the twice-modified contract on April 13, 2015. Ex. 13 at US000424. The Corps paid Kovilic a total of $811,156 for its work on the Hurricane Barrier, of which $699,785 was for work to repair the damage from the barge strike and $111,371 was for the unrelated replacement of ten additional wooden fenders. Ex. 22 at US000683.

The Corps uses a system of labor codes to track employee time. In the normal course of business, employees record their time to various labor codes that correspond to different areas of work and allow the Corps to allocate employee time to various funding sources. Each individual employee inputs how they spent their time, and these records are then reviewed and approved by the employee's supervisor. All employees receive training on how to input time, and supervisors receive additional training, including on fiscal law. After the barge struck the Hurricane Barrier, the Corps established specific labor codes to track the internal labor costs incurred by its

response to the incident. See Ex. 17. Internal labor was used to prepare plans and specifications

for the repair, bid and oversee the contract, and inspect the repairs. Ex. 22 at US000681.

Employees recorded time to these labor codes as the Corps arranged the Hurricane Barrier's

repair, and those time data were converted to dollar amounts at the Corps's standard rates, which

include an allocation of other internal Corps costs such as rent and utilities. The total internal

labor costs attributed to repairing the Hurricane Barrier from the barge strike was $131,622.75,

which amount was reviewed for accuracy by the Corps's supervisory civil engineer John

MacPherson. Ex. 22 at US000683. Along with the $699,785 paid to Kovilic, the total amount the

Corps spent on repairing the Hurricane Barrier was therefore $831,407.75.

II.     CONCLUSIONS OF LAW

The Rivers and Harbors Act provides that

> it shall not be lawful for any person or persons to . . . injure . . . or in any manner
> whatever impair the usefulness of any sea wall, bulkhead, jetty, dike, levee, wharf,
> pier, or other work built by the United States . . . for the preservation and
> improvement of any of its navigable waters or to prevent floods.

33 U.S.C. § 408. "[T]he purpose" of the Act "is to provide funds for the replacement and

maintenance of improvements built by the United States . . . through an absolute liability

standard." United States v. Ohio Valley Co., 510 F.2d 1184, 1188 (7th Cir. 1975). "[T]he penalty

is supposed to attach to the offending act without regard to the question of willfulness or intent,

and without regard to the question of mistake or innocence." Scow No. 36, New England

Dredging Co. v. United States, 144 F. 932, 933 (1st Cir. 1906). The Act further provides that the

vessels "used or employed in violating" the Act are liable in rem. 33 U.S.C. § 412.

Despite the strict liability standard that attaches in a case of this nature, "[t]he burden of

proof [i]s on the government to establish that the amount claimed [i]s reasonable and that it fairly

reflect[s] the actual costs of repairing the" structure at issue. United States v. Motor Vessel

Gopher State, 614 F.2d 1186, 1188 n.1 (8th Cir. 1980). Because Tisbury concedes its liability, the parties' arguments focus on the reasonableness of the government's claimed damages. Tisbury advances several arguments that it is not liable to the government for the full amount of the repair costs, which the Court addresses in turn.

Tisbury first argues that, as a general matter, it is entitled to a depreciation discount on damages for the repair of the gate guide beam because the government's repairs left the Hurricane Barrier in a better condition than immediately before the allision. See Doc. No. 84 at 10; Doc. No. 103 at 2, 5. Tisbury cites no case arising under the Rivers and Harbors Act in which recovery was limited by the application of depreciation.[1] The government contends alternately that depreciation is a business and tax concept inapplicable to a public work like the Hurricane Barrier, Doc. No. 87 at 17–18, and that the government is entitled to recover without deductions for depreciation where the repairs did not extend the life or otherwise increase the value of the Hurricane Barrier because the replaced part will not be retained when the rest of the Hurricane Barrier is replaced. Doc. No. 104 at 2. The government also cites no Rivers and Harbors Act case specifically precluding the application of depreciation.

With respect to the gate guide beam, the government's evidence demonstrated that the gate guide beam, at a minimum, would have continued in service until the replacement of the

---

[1] Although Tisbury cites United States v. Motor Vessel Gopher State, 472 F. Supp. 556, 559 (E.D. Mo. 1979), for the proposition that "[t]he government is entitled to have its . . . facility restored to the condition in which it was prior to the collision but no more," that case did not involve depreciation. Rather, the district court reduced its damages award because the government had failed to meet its burden to demonstrate that "the additional amount claimed over and above [its] own detailed and itemized estimate of the costs necessary to repair the damage . . . was necessary, fair and reasonable." Id. Despite the dictum cited by Tisbury, the case did not involve a contention that the repairs for which damages were sought improved the condition of the facility at issue. See id. At any rate, although the amount of the district court's award was affirmed on appeal, the Court of Appeals "disagree[d] with the use of the estimate in ascertaining the award of damages." Motor Vessel Gopher State, 614 F.2d at 1187.

Hurricane Barrier. The only gate guide beams replaced to date were replaced because of

allisions, not because they wore out. Further, the replaced gate guide beam is plainly an integral

part of the Hurricane Barrier, given that they are required for a successful dewatering of the gate

pocket, a process necessary to the Hurricane Barrier's continued functioning. Its replacement is

therefore essential to the use of the Hurricane Barrier for the remainder of its useful life.[2]

Tisbury presented no evidence that its replacement would allow the entire Hurricane Barrier as

currently installed to remain in service longer than it otherwise would have and indeed concedes

that the "expected useful life of the [Hurricane] Barrier after allision-related repairs was the same

as it had been at the time of its acquisition." Doc. No. 107 ¶ 39. "[W]here . . . repairs do not

extend the useful life of the property as it existed just before the collision, there should be no

deduction for depreciation." Freeport Sulphur Co. v. S/S Hermosa, 526 F.2d 300, 305–06 (5th

Cir. 1976). Accordingly, Tisbury is not entitled to a reduction in damages for the gate guide

beam because of depreciation.

Tisbury further argues that the Corps's process to solicit bids for the Hurricane Barrier

was flawed because it was limited to certain qualifying entities, resulting in an unreasonably

higher price. Doc. No. 107 ¶ 53. Trial evidence demonstrated that the Corps determined to bid

the repair contract exclusively to small business entities pursuant to the Federal Acquisition

Regulation's requirement that the agency "set aside any acquisition over $150,000 for small

business participation when there is a reasonable expectation that . . . [o]ffers will be obtained

from at least two responsible small business concerns . . . and . . . [a]ward will be made at fair

market prices." 48 C.F.R. § 19.502-2(b). Because the Corps had recently procured similar work,

---

[2] In addition, neither before the allision nor since has the Corps seriously considered replacing
the entire Hurricane Barrier.

it knew already that it would be likely to receive two or more bids from small businesses capable of performing the work.

Tisbury suggested at trial that the Corps's bidding was nevertheless insufficient because it failed to "obtain appropriate data . . . on the prices at which the same or similar items have previously been sold and determine if the data is adequate for evaluating the reasonableness of the price." 48 C.F.R. § 15.404-1(b)(1). However, because the Corps received three bids for the repair, it was entitled to determine that the contract was "based on adequate price competition" because "[t]wo or more responsible offerors, competing independently, submit priced offers that satisfy the Government's expressed requirement and . . . [a]ward w[as] made to the offeror whose proposal represents the best value . . . and . . . [t]here is no finding that the price of the otherwise successful offeror is unreasonable." 48 C.F.R. § 15.403-1(c)(1). More generally, Tisbury cites no authority for the proposition that the government is not entitled to seek damages under the Rivers and Harbors Act that correspond to the generally higher prices that accompany government procurement requirements. The Court finds that the Corps's procurement process was reasonable under the circumstances. Accordingly, the government is entitled to recover its repair costs that result from its standard procurement procedures.

Perhaps most significantly, Tisbury argues that the Corps's approach to the repair—first bidding a contract to replace only the top portion of the damaged gate guide beam, then modifying the contract to replace the entire beam without soliciting new bids—was unreasonable and inflated the cost of the repair beyond a reasonable level. Doc. No. 103 at 4–5. It also argues that the government's recovery is limited by its spoliation of evidence about the lower portion of the gate guide beam, id. at 9–11, and that the government's evidence about the condition of the lower gate guide beam during and after the government's contractor cut it is inadmissible

hearsay, Doc. No. 105. The Corps's decisions to award a contract to replace only the upper portion of the gate guide beam and later to replace the entire beam plainly resulted in a higher cost than simply first seeking bids to replace the entire beam, given that the stepwise process required two mobilizations and at least two rounds of production of the replacement beam. The parties' dispute is whether those decisions were reasonable.

In an admiralty case, the plaintiff must prove the facts supporting its case by a preponderance of the evidence. CEH, Inc. v. F/V Seafarer (O.N. 675048), 880 F. Supp. 940, 943 (D.R.I.). Although a strict liability standard governs this Rivers and Harbors Act action, the government nevertheless bears the burden of establishing the reasonableness of its damages calculation. Motor Vessel Gopher State, 614 F.2d at 1188 n.1.

In this case, the government elected to call only one expert, its own senior structural engineer. The Corps's expert provided no credible evidence that the Corps's decision was reasonable under the circumstances given the risk, eventually realized, that replacing only part of the beam would lead to a need for further repair. Rather, the expert described basing his decision about the best repair option on a visual inspection of the beam, which he conceded would not have revealed any induced stress causing by the barge strike. He also described his decision not to discuss the potential for hidden stress in the beam in his report recommending only partial replacement, despite his awareness that such stress was a possibility after a barge strike. He offered no credible opinion that, for example, the likely savings from retaining the lower portion of the beam was sufficient to outweigh the risk of damage to the remainder of the beam during the cutting and repair. By contrast, Tisbury's hired expert testified that the more reasonable course would have been to replace the entire beam at the outset.

For these reasons, the Court is unable to conclude on the evidence presented that the

Corps's approach to repairing the gate guide beam was reasonable under the circumstances such

that Tisbury is required to pay the full amount of damages sought. The Court therefore declines

to award the cost of the contract modification to replace the entire beam. The Court finds that the

Corps has established that it would have been reasonable to make one procurement to replace the

entire gate guide beam, the cost of which would have been at least as much as the Corps's

contract to replace the top portion. However, no evidence was presented about the likely cost to

the Corps of simply bidding the replacement of the entire beam, and the Court cannot conclude

on the present record what that cost would likely have been. The Court therefore awards only the

amount of the first contract, subject to the further provisions of this opinion.[3]

Tisbury also objects that the government failed to prove that all of the wooden fenders

were present at the time of the allision such that Tisbury is responsible for the cost of replacing

all that were missing after the allision and that the Corps's actions caused spoliation of relevant

action. Doc. No. 103 at 2–4. Tisbury argues that the "number of [fenders] for which recovery

may be considered reasonable is limited to ten," five on each side of the replaced gate guide

beam. Id. at 2. As with the gate guide beam, Tisbury also argues that damages to the wooden

fenders should be reduced for depreciation because the fenders were not new. Id. at 4.

Eight fenders above the waterline are plainly visible before the allision in the video

recording of the allision. The government's evidence demonstrated that eight missing wooden

---

[3] Tisbury has also argued that the government's actions resulted in spoliation of evidence about
the condition of the lower portion of the gate guide beam and that the government's evidence
about the condition of the beam during and immediately after it was cut was inadmissible as
hearsay. However, given the Court's ruling, evidence about the condition of the lower half of the
beam is irrelevant, and the Court need not resolve those arguments. Accordingly, Tisbury's
motions in limine, Doc. No. 90, Doc. No. 105, are DENIED as moot.

fenders, of the seventy fenders on each side of the Hurricane Barrier, had been replaced around

July 2012 as part of maintenance performed with the Hurricane Barrier's dewatering, at which

point all of the fenders were present. See Ex. 25 at US000699. The government also described

the wooden fenders as "sacrificial," intended to fend off vessels that rubbed against them,

thereby protecting the gate guide beams behind the fenders, but to break upon an allision with a

vessel as heavy as a loaded barge. The government's expert also testified that a barge strike

would destroy fenders whether they were new or old. The government's October 4, 2013,

inspection of the Hurricane Barrier showed that all of the wooden fenders at the location of the

barge strike were missing and that six of the twelve fenders that were similarly situated between

gate guide beams but not involved in the allision were missing. Ex. 27. Finally, Tisbury's expert

opined that, at the time of its October 2014 inspection, the extent of marine growth on the gate

guide beams, where the fenders would have prevented such growth, meant that the fenders had

been absent for more than the 13 months since the allision.

Given the totality of these circumstances, in which wooden fenders clearly go missing

without immediate replacement, the Court finds that the government has not demonstrated by a

preponderance of the evidence that more than ten wooden fenders were present at the time of the

allision. However, by the same turn, the evidence that some fenders were already missing

demonstrates that that the Corps would not have replaced the wooden fenders except because of

the allision. Accordingly, the cost to replace them is entirely additive to the Corps's maintenance

costs had the allision not occurred. Because the Corps is therefore no better off for having

replaced the wooden timbers as part of the allision repair, Tisbury is not entitled to a reduction in

the amount of damages for depreciation of the wooden fenders.

However, to reduce the damages award for the ten wooden fenders not shown to be present at the time of the allision, the Court must determine the cost the Corps paid to replace those fenders. Kovilic's bid for the barge strike repair work showed a price of $7,500 to replace each fender above the mean low water line and $11,750 for each fender beneath the mean low water line. Ex. 6. However, at trial, the Corps's contracting officer testified that the rates shown for bids' individual line items have little significance because a contract is awarded only on the lowest total price for a given solicitation and that, as a result, individual line items frequently vary widely based on each bidder's accounting system. For example, Tisbury pointed at trial to the contract that the Corps awarded for the July 2012 dewatering as evidence that the costs to repair the damage from the barge strike were unreasonable. That contract had a line item cost of $2,500 per wooden fender. Ex. 25 at US000699. The Court finds that the higher cost per wooden fender in the barge strike repair contract likely resulted from the nature of the mobilization required by the gate guide beam repair, which was necessary regardless of the wooden fender replacement. Accordingly, the Court reduces the Corps's damages award by only $2,500 per each of the ten wooden fenders not shown to be present at the time of the allision.

Tisbury also objects to the Corps's calculation of its internal operating costs that resulted from the allision. It argues that the Corps improperly allocated "rent, utilities, and administrative costs unrelated to the allision." Doc. No. 103 at 8. Trial testimony of Corps employees, however, explained that the Corps tracked its allision response costs using internal labor codes and then allocated other internal overhead at standard rates. These rates are reasonable, and their composition, including fixed costs such as rent and utilities, accords with "the definition of overhead, which requires only an indirect connection by definition" and allows recovery for "general operating expenses." United States v. Capital Sand Co., 466 F.3d 655, 658–59 (8th Cir.

12

2006) (allowing the Corps to recover for indirect overhead). Accordingly, the Court credits the Corps's calculation of its internal costs from the allision. See Ex. 22 at US000683. However, the Court reduces the damages for overhead for those portions of the damages reduced as described above, proportionally to their dollar amounts.

The government also seeks prejudgment interest on its damages. Doc. No. 87 at 18–19. "Prejudgment interest on admiralty claims is generally allowed on claims for prejudgment economic harm as compensation for the use of funds to which the plaintiff was ultimately judged entitled, but which the defendant had the use of prior to judgment." Borges v. Our Lady of the Sea Corp., 935 F.2d 436, 444 (1st Cir. 1991) (citations and internal quotations omitted). Because nearly six years have passed since the allision, the government "is entitled to the income which the monetary damages would have earned, and that should be measured by interest on short-term, risk free obligations." City of Bos. v. S.S. Texaco Texas, 773 F.2d 1396, 1401 (1st Cir. 1985). Although a plaintiff "may lose his right to prejudgment interest if exceptional circumstances make an award of interest inequitable," Nevor v. Moneypenny Holdings, LLC, 842 F.3d 113, 124 (1st Cir. 2016) (citations and internal quotations omitted), no such circumstances exist here. Tisbury did not oppose an award of prejudgment interest either in its briefing or at trial. The Court therefore awards prejudgment interest running from April 13, 2015, the date on which repairs were completed, see Ex. 13 at US000424, compounded quarterly at the prevailing Treasury bill rate.

IV.    CONCLUSION

The Court awards damages to the United States in the amount of $490,681.28 plus prejudgment interest. This amount includes $438,000 for the first contract awarded to Kovilic to repair the Hurricane Barrier, less a $25,000 reduction for the ten wooden fenders not shown to be

present at the time of the allision, for an adjusted amount of $413,000. Because this amount is 40.98 percent less than the amount the Corps spent to repair the Hurricane Barrier, the Court awards the same proportion of the Corps's internal overhead costs, or $77,681.28. The total award is therefore $490,681.28 plus prejudgment interest.

By August 1, 2019, the government shall, after conferring with the defendant, submit a proposed form of judgment that includes a calculation of prejudgment interest on the amount awarded herein as described above.

SO ORDERED.

 /s/ Leo T. Sorokin
Leo T. Sorokin
United States District Judge